# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VELMA LAPLAINT, | : | No. 3:06cv2246 |
|     Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| WEBILT WALK-INS, LP, t/a KYSOR | : | |
| PANEL SYSTEMS, | : | |
| PROFESSIONAL | : | |
| INSTALLATIONS, and | : | |
| CLEVELAND CONSTRUCTION, INC., | : | |
|     Defendants | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court is defendant Webilt Walk-Ins's motion for summary judgment. Having been fully briefed and argued, the matter is ripe for disposition.

**Background**

The case involves a workplace slip-and-fall accident that occurred on March 3, 2006 at the Wal-Mart store in Millford, Pennsylvania. On that date, plaintiff Velma LaPlaint was employed by the Wal-Mart as a "deli associate." (Defendant Webilt Walk-Ins' Statement of Material Facts (Doc. 75) (hereinafter "defendant's statement") at ¶ 1). Plaintiff alleges that an accumulation of ice just inside the door threshold for the walk-in deli freezer caused her to fall, leading to serious injuries. (Id. at ¶ 3). She contends that the icy condition which caused her to fall was created by a defectively designed freezer and the defendant's negligence in not taking steps to prevent ice accumulation. (Id. at ¶ 4).

The accident in question occurred at approximately 7:30 a.m. (Id. at ¶ 11). Plaintiff was the first person in the deli freezer that morning. (Id.). She began working, and as she did so her right foot slipped on ice in the doorway and she fell. (Id.). LaPlaint had noticed an ice puddle the width of the doorway and about 15-20" wide as she entered the freezer. (Id. at ¶ 12). She jumped over it. (Id.). This ice puddle had always been present in the freezer, and Wal-Mart management was aware of it. (Id. at ¶ 13). Plaintiff contends that the puddle varied in size and shape, and that the water came from the cleaning of the floor outside the freezer; water seeped in. (Plaintiff's Response to Defendant's Statement (Doc. 79) (hereinafter "plaintiff's response") at ¶ 13). The parties disagree about whether actions–such as attaching a plate to the inside of the freezer door–could have been taken to prevent water from migrating into the freezer from the cleaning process. (defendant's statement at ¶ 14; plaintiff's response at ¶ 14). They agree, however, that plaintiff was aware that this problem was a daily occurrence. (defendant's statement at ¶ 13).

The process of cleaning the deli floor involved a great deal of hosing and spraying. (Id. at ¶¶ 19-20). As part of the procedure, employees would use squeegees to move water away from the freezer door. (Id. at ¶ 19). The parties disagree about how careful workers were to prevent water from entering the freezer during this process. Defendant insists that employees used hoses to spray plastic refrigeration flaps hanging in the doorway and did not check to see if water flowed

2

into the freezer from this process and other cleaning methods. (Id. at ¶¶ 15-17). Plaintiff asserts that employees did not spray water directly into the cooler, and that water flowed inside frequently.[1] (plaintiff's response at ¶ 17). Defendant also contends that Wal-Mart workers used a high-pressure hose to wash inside the freezer, squeegeeing the subsequent water towards a floor drain. (defendant's statement at ¶ 21). Plaintiff denies that this procedure occurred. (plaintiff's response at ¶ 21). In any case, both sides agree that ice frequently accumulated in the freezer. (defendant's statement at ¶ 30). Workers took various steps to try and remove it. (Id.).

According to the defendant, all of the evidence indicates that ice in the deli freezer came from a result of actions to hose the freezer during cleaning, a poor slope in the floor, and lax housekeeping by Wal-Mart. (Id. at ¶ 25). None of the other freezers in the store had ice accumulate in them. (Id. at ¶ 27). Defendant also emphasizes that Wal-Mart employees did not check the freezers to see if water had accumulated inside after they cleaned. (Id. at ¶ 29). Plaintiff insists that this seeping

---

[1]One crucial witness to this entire process is Ann Marie Henderson, a former Wal-Mart employee. Defendant contends that she worked the night in question, and that she testified that as part of the cleaning process she typically sprayed water into the freezer doorway, which would then flow into the freezer itself. (defendant's statement at ¶ 17). Plaintiff insists that Henderson did not work on the night in question, pointing to deposition testimony from Henderson where she could not recall if she worked. (plaintiff's response at ¶ 18). Defendant cites to an attendance record that indicates she had worked that day. (defendant's statement at ¶ 18). According to the defendant, a notation next to her name saying "no" had been added by a lawyer making a list of which employees still worked for Wal-Mart. (Id.).

3

and ice accumulation came as a result of an improper hinge and gasket installed on the freezer door. (plaintiff's response at ¶¶ 25-26). The water "infiltrated" the freezer after every cleaning. (Id. at ¶ 30). From the plaintiff's perspective, no amount of improved maintenance could have prevented the seepage problem. (Id. at ¶ 44).

Defendant Cleveland Construction Company was the general contractor on the remodeling of the Wal-Mart that transformed it into a Super Center. (defendant's statement at ¶ 31). The project opened in July 2006. (Id.). A subcontractor for Cleveland supplied the cement floor in the area near the deli. (Id. at ¶ 32). That contractor sealed the floor. (Id.). Defendant Professional Installations later installed the deli freezer, encountering problems with leveling the floors. (Id. at ¶ 33). Various other subcontractors and workers were involved in installing the refrigerator and related materials. (Id. at ¶ 34). Among them were third-party defendant ABC Refrigeration. (Id.). Wal-Mart and Cleveland Construction reviewed the installation at the completion of the work. (Id. at ¶ 35). Jim Wetzel, assistant superintendent of Cleveland Construction, performed a checklist examination of the deli-bakery freezer on September 15, 2005. (Id. at ¶ 37). According to Wetzel's checklist, 28 categories of inspection were performed, and the panels found to be level and plumb and the doors adjusted properly with "no daylight door sweep." (Id.). Defendant also contends that Wal-Mart employed an independent testing agency to see that the project met specifications, but no records from the testing has been produced. (Id. at ¶ 36; plaintiff's response at ¶ 36).

4

A job list generated by Kysor Panel Systems on November 16, 2005 contained a directive to adjust the door sweep for the deli bakery/freezer. (defendant's statement at ¶ 38). The company serviced the bakery freezer on January 31, 2006. (Id. at ¶ 39). This unit is the same one as the deli freezer in question, and no evidence existed to demonstrate water traveled under the bakery freezer door. (Id. at ¶ 40). The parties disagree over whether the doors are identical. (plaintiff's response at ¶ 40).

The product in question here is the "freezer door sweep." (defendant's statement at ¶ 41). The sweep sits at the bottom of the freezer door, and defendant states that its purpose is to "keep hot air/moisture laden air from traveling underneath and into the freezer and thus prevent thermal frost/ice from building up on the floor inside." (Id.). The sweep contains a heater designed to keep as much heat as possible "at the point of thermal transfer." (Id.). The device is not designed to keep out water and is meant to be installed on a level slab. (Id.). Plaintiff claims that this device was defective because a "compressible bulb gasket and cam hinges" should have been used to lower the door at the point of closure, compressing the gasket and preventing water from seeping in. (plaintiff's response at ¶ 41). That defect, along with a floor that sloped towards the interior of the freezer rather than away from it, allowed seepage. (Id.). Such devices are common and available and should have been installed here, plaintiff claims. (Id.).

Twice in a short time before the March 3, 2006 accident, Wal-Mart called ABC

5

refrigeration to report water accumulating and freezing at the threshold of the deli freezer. (defendant's statement at ¶ 42). ABC adjusted the door sweep and advised Wal-Mart that the problem was housekeeping; a worker allegedly was spraying inside the freezer. (Id. at ¶ 43). Fred Dollar of ABC Refrigeration told Wal-mart that the floor was not level, but sloped towards the freezer door and seep underneath it. (Id. at ¶ 45). Wal-Mart was advised that the door sweep would not prevent water seepage, and the company promised to take action to correct the problem. (Id. at ¶ 44). According to plaintiff, Wal-Mart never found a way to prevent this seepage until a new part, a diamond plate at the freezer threshold, was installed. (plaintiff's response at ¶ 44). On February 27, 2006, ABC Refrigeration performed maintenance on the door. (defendant's statement at ¶ 47). Defendant contends that ABC replaced the sweep, but plaintiff contends that the evidence shows that ABC merely readjusted the door sweep to its proper place and reattached the old sweep with proper screws. (Id.; plaintiff's response at ¶ 47). Cleveland Construction was responsible for ensuring the deli freezer doorway threshold was flush, but there is no evidence that Cleveland ever checked to ensure that the doorway threshold was flush. (defendant's statement at ¶¶ 50-51).

Plaintiff filed a complaint in this matter on November 17, 2006 (Doc. 1). She filed several amended complaints, the final on February 14, 2008 (Doc. 26). That complaint raised several counts, several of which involve the moving defendant. Count I accuses Webilt of strict products liability in the manufacture of the freezer

6

door. Count II alleges negligence against Defendant Webilt for failing adequately to warn users about potential hazards with that freezer. Count III alleges breach of warranty against Webilt. Webilt allegedly sold a freezer that was neither merchantable nor fit for a particular purpose for which it was intended. After answers, counterclaims, and crossclaims, Defendant Webilt filed the instant motion. The parties then briefed the motion and the court held argument, bringing the case to its present posture.

**Jurisdiction**

This court has jurisdiction pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332. Plaintiff is a Pennsylvania resident. The defendants are corporations with citizenships in other states. The amount in controversy exceeds $75,000. Because the court is sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Legal Standard**

The case is before the court on defendant's motion for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence

7

of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. <u>Id.</u> Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986).

**Discussion**

The defendant seeks summary judgment on several grounds. The court will address each in turn.

**1. Strict Products Liability**

The defendant first argues that the court should grant summary judgment on plaintiff's strict products liability claim. The defendant argues that nothing in the

8

evidence indicates that the product was unreasonably dangerous when it was installed.

### a. Risk/Utility Factors

This case involves a claim of strict products liability. As a preliminary matter, "the Pennsylvania Supreme Court has remained faithful to its view that negligence concepts have no place in a products liability trial." Habecker v. Clark Equip. Co., 36 F.3d 278, 282 (3d Cir. 1994). Thus, "[t]he test for defectiveness is whether the 'product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use.'" Id. (quoting Azzarello v. Black Bros. Co., 391 A.2d 1020, 1027 (Pa. 1978)). To prevail on a products liability claim, a plaintiff must demonstrate "that: (1) the product was defective, (2) the defect existed while the product was in control of the manufacturer, and (3) the defect was the proximate cause of the injuries." Id. at 284. Pennsylvania courts have found "that a product is defective when it is not fit for the intended use for which it was sold." Colville v. Crown Equip. Corp., 809 A.2d 916, 922 (Pa. Super. Ct. 2002). Further, "'the intended use of a product includes all those [uses] which are reasonably foreseeable to the seller." Parks v. Allied Signal, 113 F.3d 1327, 1331 (3d Cir. 1997) (quoting Pacheco v. Coats Co., Inc., 26 F.3d 418, 422 (3d Cir. 1994)) (internal quotations omitted).

Courts in Pennsylvania have found that "strict liability allows recovery when a defective product that is 'unreasonably dangerous' causes harm to a user or

9

consumer." Moyer v. United Dominion Indus., 473 F.3d 532, 538 (3d Cir. 2006) (citing Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1170 (Pa. 1995)). The decision of whether a product is unreasonably dangerous is a question of law, and thus left to the court rather than to the jury. Id. Therefore, "in a strict product liability action, before the case can be placed before the jury, the judge must make a threshold determination whether the defect alleged, if proven, would render the product 'unreasonably dangerous" as the term is defined in the Restatement (Second) of Torts § 402A." Barker v. Deere & Co., 60 F.3d 158, 166 (3d Cir. 1995). To do so, a court must "'engage in a risk-utility analysis, weighing a product's harms against its social utility.'" Id. (quoting Surace v. Caterpillar, Inc., 111 F.3d 1039, 1044 (3d Cir. 1997)). A number of factors are relevant to this analysis:

> (1) The usefulness and desirability of the product–its utility to the user and to the public as a whole; (2) The safety aspects of the product–the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

Id. (quoting Surace, 111 F.3d at 1046).

In making this determination, "'the court must first view the evidence in the light most favorable to the plaintiff.'" Barker, 60 F.3d at 166 (quoting Burch v. Sears, Roebuck and Co., 467 A.2d 615, 618-19 (Pa. Super. Ct. 1983)). The court will address each

10

of these factors in turn.[2]

## 1. Usefulness and Desirability of the Product

The product here in question is a walk-in freezer. More specifically, the product with an allegedly defective design is the "freezer door sweep," a device designed to prevent moisture and warm air from getting into the freezer from warmer areas outside when closed. The court finds that this device is both useful and desirable. To a large operation like Wal-Mart, a walk-in freezer is essential for storing frozen and perishable products that are part of the store's business. Moving such products to the sales floor is an important part of the sales operation. Since such a freezer typically is located near food-preparation areas that need frequent cleaning to remain hygienic, a danger exists that water used in cleaning will flow into the freezer and create a slippery, dangerous surface. Workers, as did plaintiff, could easily become injured by falling in such areas. Thus, a device designed to keep water from entering the freezer is both useful and desirable.

## 2. The Safety Aspects of the Product

Plaintiff submits the report of Robert J. Illo, an architect and professional engineer, to support her claim that the freezer suffered from an unsafe design. Illo reports that he examined the product in question on April 21, 2009. (Exh. 1 to plaintif's brief in opposition (Doc. 67) at 3) . Illo also examined depositions, design

---

[2]Neither party briefed these factors. They did discuss them at oral argument. Despite this failure by the lawyers, the court is obligated to address the factors before allowing the case to go to trial.

11

drawings, photographs, invoice records, service reports, and Wal-Mart procedures related to the freezer and the door. (Id.). His report describes the design of the door, concentrating on the way that the design attempts to form a seal between the bottom of the door and a metal plate on the floor. (Id. at 5). Illo concludes that the design of the door contributed to the accumulation of ice inside the freezer which caused plaintiff to slip and fall. (Id. at 6). Wal-Mart employees washed the floor in the delicatessen and "water infiltrated between the seal and the threshold" of the door. (Id.). An improper sloping of the floor "allow[ed] water to dwell against the threshold" and eventually led to the ice accumulation that caused plaintiff's injuries. (Id.). Illo identifies as a defect the design of the door: defendant failed "to use a compressible bulb gasket and cam hinges which lower the door at the point of closure, compressing the gasket" and preventing water from entering the freezer. (Id.).

  The court concludes that this factor weighs in favor of the plaintiff. Plaintiff's expert has concluded that the door as designed improperly allowed water to flow into the freezer. An icy and slippery floor is always dangerous, and particularly in a place where busy workers carrying items or pushing carts are required to enter frequently during the work day. While the defendant may challenge the persuasiveness of Illo's conclusions, or point to other facts which may undermine his claims, the court concludes that the report presents evidence sufficient to satisfy plaintiff's burden on this point.

12

### 3. The Availability of a Substitute Product

Illo's report identifies a substitute product, emphasizing that "[t]his type of hinge and gasket is common and available for use with a freezer adjacent to a wet department." (Id.). Viewing the evidence in the light most favorable to the plaintiff, the court concludes there is evidence that a substitute product suitable for keeping water from flowing underneath the door and which would have performed the task more capably than defendant's design was available to replace the defective part.

### 4. Ability to Eliminate Unsafe Features of the Product

According to Illo's report, the product could have been made safe by changing the sweep on the bottom of the door and by changing the type of hinges on that door. Illo does not offer an estimate of this cost, but defendant likewise does not submit evidence to demonstrate the cost of replacing the door sweep and hinges would be significant or that using a different kind of hinge and sweep would impair the door's operation. As such, this factor weighs in the plaintiff's favor.

### 5. Ability of User to Avoid Danger

The alleged defect here causes an accumulation of ice just inside the threshold of the freezer's doorway. Such ice tends to accumulate after workers clean and wash the floor of the area surrounding the freezer. Some evidence also indicates that cleaning the freezer itself could lead to ice accumulation. While using a minimum of water and engaging in careful mopping–as defendant suggests–might prevent pooling and flowing of wash water into the freezer, the court concludes that

13

the problem presented by the alleged defect–the inability to prevent the flow of water into the freezer cannot be sufficiently avoided through careful use. A kitchen area requires frequent, fast mopping, and spills of water and other liquids are certainly possible in a kitchen environment. With a door that allows water to seep into the freezer, the exercise of care will not prevent frequent danger.

### 6. Warnings About the Danger of Product

In considering the user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction, the court finds that a user would not normally consider accumulated ice on the freezer's threshold a normal and obvious feature of the product. Moreover, to the extent that ice accumulating in the entryway of the freezer could become obvious, a user required to enter the freezer could not safely avoid that danger through any obvious means. This factor therefore weighs towards finding the design dangerous.

### 7. Ability of Manufacturer to Spread Loss

The court finds that this factor weighs in favor of a finding for the plaintiff. The problem here is the lack of a gasket or other device on the bottom of the door that creates a water-tight seal. As explained above, plaintiff's expert has indicated that an alternative device exists to form this seal. No evidence has been provided to determine the cost of this product, though the report indicates that such devices are in wide use. The court therefore finds that evidence exists that the cost of the

additional safety measure could reasonably be spread by the manufacturer.  This factor likewise weighs in favor of a finding of strict products liability.

### b.  The Risk-Utility Factors in Sum

After applying the risk-utility factors, the court finds that, if proven, the alleged defect would render the product unreasonably dangerous.  A jury should be allowed to evaluate the report and arguments of the plaintiff's expert and determine whether the product exhibited the design dangers alleged by the plaintiff.

### c.  Conclusion on Strict Products Liability

The defendant points to other evidence and other parties who may have contributed to the problems caused by the freezer as well.  Defendant insists that the plaintiff's injuries were caused by a Wal-mart co-worker spraying water in the freezer, an improper slope to the floor installed by another defendant, and by repairs done to the door shortly before the plaintiff fell.  Plaintiff points to the deposition testimony of Mike Hinkley, who allegedly performed service on the door in question. (See Deposition of Mike Hinkley, Exh. 3 to Plaintiff's Brief in Opp. (Doc. 68))  Hinkley testified that he could not recall the exact nature of the service he performed; he may have replaced some screws in the door, and may have made some adjustments, but he could not recall any specific actions.  (Id. at 12-13).  Plaintiff also points to evidence which calls into question whether an employee sprayed water into the freezer shortly before her fall, and whether that employee was actually working on the day of plaintiff's injury.  (Deposition of Ann-Marie Henderson, Exh. 5 to plaintiff's

15

brief in opp. (Doc. 68) at 43). Defendant contends that the alleged manufacturing defect was not the cause of plaintiff's injury. The evidence cited by plaintiff, the non-moving party, creates a question of fact as to the cause of plaintiff's injuries. As such, the court concludes that the evidence of design defect is sufficient to allow a jury to evaluate these questions.

Defendant also argues that the product was serviced four days before the accident by ABC, and that in this service ABC removed the original door sweep and replaced that device with one manufactured by a third party. Such a change, which could not reasonably have been foreseen by the defendant, amounts to a substantial alteration and eliminates any liability for the original manufacturer. The purpose of the door sweep is not to stop the flow of water and the accumulated water and ice was caused by improper cleaning, not the door's design. Moreover, a Wal-Mart worker, Ann Marie Henderson, cleaned the freezer using a pressurized hose shortly before the injury. She left the ice in the freezer, not the defective door design. That, combined with Cleveland Construction's negligent construction on the floor created the dangerous condition, not defendant. Finally, plaintiff was aware of the accumulated ice and walked across it anyway. She therefore failed to exercise reasonable care and the manufacturer cannot be liable.

The court will deny the summary judgment motion on these grounds as well. As related in the background section above, there are factual disputes as to the extent of the work performed on the door, as well as to the degree that negligence of

16

and actions by other parties, such as those performing work on the door or Wal-Mart employees, contributed to the cause of plaintiff's injuries. These disputes about where to lay blame are the province of the jury. The court here finds that plaintiff has advance evidence sufficient for a jury to exercise its judgment on this question.

**2. Negligence**

Defendant also seeks summary judgment on plaintiff's negligence claim. Defendant argues that plaintiff's claims against the manufacturer sound in strict products liability and not in negligence. No evidence exists of general acts of negligence by the defendant, and summary judgment is therefore appropriate on the claim. Plaintiff responds that Illo's expert report demonstrates that there was negligence in the design of the product. Therefore, an issue of fact remains as to the existence of negligence in the case.

Under Pennsylvania law, negligence occurs when "'the defendant had a duty to conform to a certain standard of conduct; . . . the defendant breached that duty; [and] such breach caused the injury in question; and actual loss or damage.'" Wisniski v. Brown & Brown Ins. Co. of Pennsylvania, 906 A.2d 571, 575-76 (Pa. Super. Ct. 2006) (quoting Phillips v. Cricket Lighters, 841 A.2d 1000, 1008 (Pa. 2003)). Plaintiff contends that defendant breached its duty to the plaintiff by failing to design a safe product. Such a claim does not point to any conduct by the defendant in installing or manufacturing the product that caused plaintiff's injury, but instead points to the way that defendant designed the product. Plaintiff's negligence claim,

17

therefore, is not a claim independent of the strict liability discussed above. As such, the negligence claim is subsumed by the strict products liability claim. Summary judgment is therefore appropriate on the negligence claim, and the court will grant the motion on this point.

### 3. Breach of Warranty

Defendant argues that plaintiff has not produced any evidence to support her claim of breach of express warranty, which requires a showing of an express promise made by seller to buyer which relates to the goods. Here, defendant insists, no evidence demonstrates that any such promises were made. Defendant also argues that no evidence exists of a breach of implied warranties of merchantability and fitness for particular purpose. First, defendant argues that the product performed as promised, and therefore no breach of implied warranty can exist. Secondly, the warranty that defendant provided with the product stated expressly that defendant makes "no warranty or [sic] merchantability and no warranty of fitness for any particular purpose." As such, defendant argues, judgment must be granted on this claim.

The argument here centers on an alleged breach of implied warranty of merchantability and implied warranty of fitness for a particular purpose. A warranty of "merchantability" "require[s] that [goods] have an inherent soundness which makes them suitable for the purpose for which they are designed, that they are free from significant defects, that they perform in the way that goods of that kind should

18

perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used." Gall v. Allegheny County Heath Dep't., 555 A.2d 786, 789-90 (Pa. 1989). "A warranty of fitness for a particular purpose is based upon a special reliance by the buyer on the seller to provide goods that will perform a specific use envisaged and communicated by the buyer." Id. at 790.

Plaintiff argues that the design of the freezer allowed water improperly to flow under the door, causing conditions inside the freezer to become unsafe. Such a defect meant that the freezer door was unsuitable for its intended purpose and of less than its intended quality. The court finds that evidence exists by which a jury could conclude that defendant delivered a product that breached the implied warranty of merchantability. As explained above, the plaintiff has presented evidence that the door, as designed, did not prevent water from seeping into the freezer area, causing injury when water froze on the freezer floor. A jury could therefore find that defendant provided plaintiff a door that failed to perform as such doors should perform in its usual functions. The court will deny summary judgment on this claim.

**Conclusion**

For the reasons stated above, the court will deny the defendant's motion on the products liability and breach-of-warranty claims, but grant the motion on the negligence claim. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VELMA LAPLAINT, | : | No. 3:06cv2246 |
|     Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| WEBILT WALK-INS, LP, t/a KYSOR PANEL SYSTEMS, PROFESSIONAL INSTALLATIONS, and CLEVELAND CONSTRUCTION, INC., | : | |
|     Defendants | : | |

## ORDER

**AND NOW**, to wit, this 15th day of December 2010, Defendant Webilt Walk-Ins's motion for summary judgment (Doc. 64) is hereby **GRANTED** in part and **DENIED** in part, as follows:

1. The motion is **GRANTED** with respect to plaintiff's negligence claim; and

2. The motion is **DENIED** in all other respects.

BY THE COURT:

s/ James M. Munley
JUDGE JAMES M. MUNLEY
UNITED STATES DISTRICT COURT